UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE BAIL PROJECT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-00862-JPH-MJD |
| | ) | |
| COMMISSIONER, INDIANA DEPARTMENT OF INSURANCE, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

The Bail Project is a nonprofit organization that pays cash bail for pretrial defendants. A new Indiana law, House Enrolled Act 1300, would require The Bail Project to be certified with the Indiana Department of Insurance and preclude it from paying cash bail for certain defendants.

The Bail Project alleges that HEA 1300—which becomes effective July 1, 2022—violates the First Amendment's right to free speech and the Fourteenth Amendment's Equal Protection Clause. The Bail Project has filed a motion for a preliminary injunction that would prevent the Department of Insurance from enforcing HEA 1300 against it. Because The Bail Project has not shown a likelihood of success on the merits justifying a preliminary injunction, that motion is **DENIED**. Dkt. [6].

1

# I.
# Facts & Background[1]

### A. Pretrial Release in Indiana

Indiana law "strongly encourages pretrial release for many accused individuals awaiting trial." *DeWees v. State*, 180 N.E.3d 261, 268 (Ind. 2022) (citing Ind. Cr. R. 26). Accordingly, "if a defendant presents no 'substantial risk of flight or danger' to others, the [state] court must consider releasing the defendant without money bail or surety." *Id.* (quoting Ind. Code §§ 35-33-8-3.2(a); 35-33-8-3.8(a)).

The state court may decide, however, that a risk of flight or risks to public safety require money bail. *Id.* at 267–68. That money bail can be a surety bond, which requires a partial payment (usually 10 percent of the bail amount) to a bail-bond agent. Dkt. 25-1 at 11–12 (Embree Dep.). Or it can take the form of cash bail, which requires a full payment. *Id.* Generally, anyone can pay cash bail for a defendant. *Id.* at 8.

### B. The Bail Project

The Bail Project is a nonprofit corporation "committed to advocating for an end to cash bail and the system of conditioning a person's pretrial release from confinement upon the payment of money." Dkt. 25-2 at 1 (Gaspar Decl.). It believes that cash bail "will often be impossible for an indigent accused person to pay," resulting "in significant and potentially permanent disruption of

---

[1] By agreement of the parties, there has been limited discovery and no evidentiary hearing. *See* dkt. 16; dkt. 17. The Court therefore bases these facts on the written record, including the complaint and designed evidence.

the lives of individuals accused of a crime and that of their families, and further prolongs the cycle of poverty that entraps persons." *Id.* at 2.

Because of those beliefs and the presumption of innocence, and to show that "bail is not necessary to ensure court appearances," The Bail Project pays cash bail "at no cost" to its clients. *Id.* at 2–4. It also provides what it calls "Community Release with Support" to help clients by providing "reminders about court dates, transportation assistance, and voluntary referrals to social services and community resources." *Id.* at 3. The Bail Project provides these services in twenty states and has supported "more than 22,000 low-income persons" in appearing for over 72,000 court dates, "for a 92% appearance rate." *Id.* In Indiana, The Bail Project "has assisted approximately 1,000 pretrial defendants" in Marion and Lake Counties. *Id.* at 5–6.

In short, "The Bail Project's goal is to eliminate the need for its existence by demonstrating through its expressive advocacy of paying cash bail that bail is not necessary to ensure that persons appear for court appearances." *Id.* at 4. It "views this form of advocacy as far more persuasive than a rally, a social media post, a rented billboard, or contributing to political candidates." *Id.* at 5.

### C. House Enrolled Act 1300

In early 2022, the Indiana General Assembly passed, and Governor Holcomb signed into law, House Enrolled Act 1300 (to be codified at Ind. Code § 27-10-2-4.1 et seq. (eff. July 1, 2022)). *See* dkt. 1 at 3–4. HEA 1300 requires the Indiana Department of Insurance's commissioner to regulate "a charitable bail organization," which is defined as a business entity or nonprofit

3

organization "that exists for the purpose of paying case bail for another person."[2]  Ind. Code §§ 27-10-2-4.1; 27-10-2-4.5(a).

HEA 1300 also outlines when a charitable bail organization may apply for certification, and when the commissioner should certify the applicant:

> (b) The commissioner may certify a charitable bail organization if the charitable bail organization:
>   (1) is a business entity, or a nonprofit organization under:
>     (A) the Internal Revenue Code; or
>     (B) Indiana law;
>   (2) is currently registered to do business in Indiana;
>   (3) is located in Indiana; and
>   (4) exists for the purpose of depositing cash bail for an indigent defendant who:
>     (A) is not charged with a crime of violence; or
>     (B) if charged with a felony, does not have a prior conviction for a crime of violence.
>
> (c) A person may apply for certification under this section in accordance with rules adopted under this section.
>
> (d) The commissioner shall certify a person as a charitable bail organization if the:
>   (1) person pays an application fee of three hundred dollars ($300);
>   (2) person meets the requirements of this section; and
>   (3) person, including an officer or director of the person, has not engaged in conduct that:
>     (A) constitutes fraud, dishonesty, or deception;

---

[2] HEA 1300 includes exceptions, not relevant here, if bail is paid for fewer than three people in a 180-day period or is paid for a relative.

4

    (B) constitutes malfeasance, misfeasance, or nonfeasance in dealing with money; or
    (C) resulted in the suspension or revocation of a previous certification.

              \*    \*    \*

(f) The commissioner shall deny, suspend, revoke, or refuse to renew certification for any of the following causes:
    (1) Any cause for which issuance of the certification could have been refused had it then existed and been known to the commissioner.
    (2) Violation of any laws of this state in the course of dealings under the certification;
    (3) Material misstatement, misrepresentations, or fraud in obtaining the certification.
    (4) Misappropriation, conversion, or unlawful withholding of money belonging to donors or others and received in the conduct of business under the certification.
    (5) Fraudulent or dishonest practices in the conduct of business under the certification.
    (6) Willful failure to comply with or willful violation of any proper order or rule of the commissioner.
    (7) When, in the judgment of the commissioner, the certificate holder has, in the conduct of affairs under the certification, demonstrated:
        (A) incompetency or untrustworthiness;
        (B) conduct or practices rendering the certificate holder unfit to carry on charitable bail activities or making the certificate holder's continuance detrimental to the public interest; or
        (C) that the certificate holder is no longer in good fair carrying on as a charitable bail organization;

5

> and for these reasons is found by the commissioner to be a source of detriment, injury, or loss to the public.
> (8) The listing of the name of the applicant or certificate holder on the most recent tax warrant list supplied to the commissioner by the department of state revenue.
>
> (g) A charitable bail organization must comply with all of the following:
> > (1) if the charitable bail organization pays, or intends to pay, bail for more than three (3) individuals in any one hundred eighty (180) day period, the charitable bail organization must be certified by the commissioner under this section before soliciting or accepting donations for bail for another person, and before depositing money for bail for another person.
> > (2) A charitable bail organization may not pay bail for a defendant who:
> > > (A) is charged with a crime of violence; or
> > > (B) is charged with a felony and has a prior conviction for a crime of violence.

Ind. Code. § 27-10-2-4.5.

To summarize, the commissioner may certify a charitable bail organization if it exists to pay cash bail in Indiana, but not for defendants who (1) are charged with a crime of violence or (2) are charged with a felony and have a prior conviction for a crime of violence.[3]  *See* Ind. Code. § 27-10-2-4.5(b), (g).  The commissioner must also promulgate rules for applications, Ind. Code. § 27-10-2-4.5(c), but she has not yet done so, dkt. 25-1 at 21 (Embree

---

[3] HEA 1300 incorporates the definition of "crime of violence" in Ind. Code § 35-50-1-2(a); the included offenses are not relevant to this order.

Dep). HEA 1300 also explains the reasons why the "commissioner shall deny, suspend, revoke, or refuse to renew certification," including misrepresentations, fraud, dishonesty, incompetency, and detriment to the public interest. Ind. Code § 27-10-2-4.5(f).

### D. Procedural History

Once HEA 1300 goes into effect, The Bail Project will have to be certified as a charitable bail organization to continue assisting defendants in Indiana. *See* dkt. 26 at 9. Even if it becomes certified, The Bail Project would no longer be able to pay bail for defendants who are charged with a crime of violence or are charged with a felony and have been convicted of a crime of violence. *Id.* at 9–10. The Bail Project therefore brought this action, alleging that HEA 1300's restrictions violate (1) its right to free speech under the First Amendment and (2) the Fourteenth Amendment's Equal Protection Clause. Dkt. 1 at 14–15.

The Bail Project has also filed a motion for a preliminary injunction under Federal Rule of Civil Procedure 65, requesting that the Court "enjoin[ ] the enforcement of HEA 1300 against The Bail Project." Dkt. 26 at 25.

## II.
## Applicable Law

Injunctive relief under Federal Rule of Civil Procedure 65 is "an exercise of very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021). To obtain such extraordinary relief, the party seeking the preliminary injunction carries the burden of persuasion by a clear showing. *See id.*; *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Determining whether a preliminary injunction is appropriate under Rule 65 involves a two-step inquiry, with a threshold phase and a balancing phase. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017).  At the threshold phase, the moving party must show that: (1) without the requested relief, it will suffer irreparable harm during the pendency of its action; (2) traditional legal remedies would be inadequate; and (3) it has "a reasonable likelihood of success on the merits."  *Id.*  "If the moving party cannot establish . . . these prerequisites, a court's inquiry is over and the injunction must be denied."  *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

If the movant satisfies the threshold requirements, the Court proceeds to the balancing phase "to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests."  *Whitaker*, 858 F.3d at 1044.  This "involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa."  *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020).

### III.
### Analysis

The Bail Project argues that it has shown that it is entitled to preliminary injunctive relief.  *See* dkt. 26 at 12–25.  The Commissioner disputes only likelihood of success on the merits, arguing that The Bail Project is not entitled to a preliminary injunction because it is unlikely to succeed on any of its

claims. *See* dkt. 29 at 23. The Court therefore begins with evaluating The Bail Project's likelihood of success on each of its claims.

### A. First Amendment Expression

The Bail Project argues that by paying cash bail for defendants, it is engaging in free speech either as speech or as inherently expressive conduct. Dkt. 26 at 12–14, 16–22. It therefore contends that HEA 1300 is an impermissible content-based regulation of activity that is protected under the First Amendment. *Id.* The Commissioner responds that HEA 1300 at most incidentally burdens protected speech because the act of paying cash bail is not speech or even inherently expressive conduct. Dkt. 29 at 13–21.

### 1. Whether Paying Cash Bail is Speech

The Bail Project first argues that the payment of cash bail on behalf of individual defendants is "pure speech" because that action is "expending money to advocate for matters of interest." Dkt. 26 at 12. It relies primarily on Supreme Court precedent holding that certain limits on campaign contributions violate First Amendment protections for political speech. *Id.* at 12–13. The Commissioner responds that The Bail Project's bail payments are not the same because they are "neither express-advocacy-election spending nor direct spending for political speech." Dkt. 29 at 16.[4]

The cases that The Bail Project relies on do not show that paying bail is speech. *Citizens United v. Federal Election Commission* involved a challenge to

---

[4] The Bail Project drops this argument in its reply, arguing only that its actions are expressive conduct. *See* dkt. 32 at 4–8.

9

a law that expressly limited "expenditures for speech defined as an 'electioneering communication' or for speech expressly advocating the election or defeat of a candidate." 558 U.S. 310, 318–19 (2010). So the donations at issue there—to a nonprofit for making a documentary about then-Senator Hillary Clinton—were aimed directly at speech. *Id.* at 319, 339, 372 ("The civic discourse belongs to the people, and the Government may not prescribe the means used to conduct it."). Similarly, *Meyer v. Grant* held that a ban on paying political-petition circulators "involve[d] core political speech" because engaging in political discussions through a petition is speech. 486 U.S. 414, 420–22 (1988).[5] In short, as the Supreme Court recently repeated, campaigns necessarily involve "debate on public issues [that] should be uninhibited, robust, and wide-open," so restrictions on them implicate speech. *Federal Election Commission v. Cruz*, 142 S. Ct. 1638, 1650–52 (2022).

The Bail Project has not argued that paying cash bail is directly attached to speech or explained how it could implicate speech or public debate in a similar way, so it has not shown a likelihood of success on this theory. *See* dkt. 26 at 12–14.

### 2. Whether Paying Cash Bail is Inherently Expressive Conduct

In addition to protecting actual speech, the First Amendment protects some conduct. *Texas v. Johnson*, 491 U.S. 397, 403–04 (1989) ("[W]e have long

---

[5] The Bail Projects also cites *Holder v. Humanitarian Law Project,* but the Supreme Court there considered a regulation directly on speech (given the nature of plaintiffs' as-applied challenge), not whether providing financial support was speech rather than conduct. 561 U.S. 1, 28 (2010).

10

recognized that [the First Amendment's] protection does not end at the spoken or written word."). But the First Amendment's protection "extends only to conduct that is '*inherently* expressive.'" *Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017) (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006)).

Whether conduct is inherently expressive focuses on two questions. First, was there "an intent to convey a particularized message"? *Johnson*, 491 U.S. at 404. Second, was "the likelihood great that the message would be understood by those who viewed it"? *Id.*

Here, it's uncontested that The Bail Project's intent in paying cash bail is to communicate that a system of cash bail is unnecessary. *See* dkt. 25-2 at 4; dkt. 29 at 13–14; *but see Johnson*, 491 U.S. at 404 (explaining that conduct is not protected merely because "the person engaging in the conduct intends thereby to express an idea"). The parties disagree, however, on who the relevant audience is for The Bail Project's conduct and thus dispute whether "the conduct *itself* . . . can be readily 'understood by those who view it.'" *Tagami*, 875 F.3d at 378 (quoting *Johnson*, 491 U.S. at 404). The Bail Project argues that its audience is Indiana's criminal-court judges and that they understand The Bail Project's message—cash bail is unnecessary. Dkt. 32 at 6–7. The Commissioner argues that objective observers would not catch that message because they would see only "a financial transaction at the clerk's office—that same transaction that anyone paying another's bail . . . would

11

engage in, whether they objected to the cash bail system or not." Dkt. 29 at 14.

To determine the relevant audience, courts look to "those who viewed" the relevant conduct. *Johnson*, 491 U.S. at 404. So in *Tagami*, the Seventh Circuit considered whether onlookers "in public places around Chicago" would recognize that the plaintiff's toplessness was a protest against laws preventing "women from appearing bare-chested in public." 875 F.3d at 379. And in *Clancy v. Office of Foreign Assets Control*, the Seventh Circuit concluded that a "person observing Clancy's travels to Iraq would have no way of knowing" that he did so to protest the war there. 559 F.3d 595, 605 (7th Cir. 2009). Applying those precedents to the conduct here—paying cash bail for *individuals*, dkt. 32 at 6–7—the audience is the clerk's office staff and any members of the public present when The Bail Project employees come to deposit cash bail. *See* dkt. 25-2 at 5. And The Bail Project's individual payments do not communicate a message to an objective observer, just as in *Tagami*, 875 F.3d at 379, and *Clancy*, 559 F.3d at 605.

Moreover, even if Indiana's criminal-court judges were The Bail Project's audience for this First Amendment analysis, it would not have a likelihood of success on this claim. That's because it is The Bail Project's subsequent speech, rather than the act of paying cash bail, that informs those judges of its message. As The Bail Project admits, the judges learn of The Bail Project's actions from "The Bail Project filing quarterly reports and providing further information to the courts on demand." Dkt. 32 at 7. So "[t]he expressive

component" that the Bail Project ultimately relies on "is not created by the conduct itself but by the speech that accompanies it." *Rumsfeld*, 547 U.S. at 66. In other words, the judges receive no message from The Bail Project's conduct, but from its later speech directly to them—speech that HEA 1300 does not regulate. *See Tagami*, 875 F.3d at 378 ("To fall within [the inherently expressive conduct] doctrine, the conduct in question must *comprehensively* communicate its own message *without additional speech*." (emphases added)).

Indeed, The Bail Project's intended message—that the cash bail *system* is unnecessary—requires the communication of additional, more comprehensive, information. Dkt. 32 at 6–7; *see Tagami*, 875 F.3d at 378. The Bail Project cannot transform its limited conduct into speech by following up with reports to a different audience. *See Rumsfeld*, 547 U.S. at 66 ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it."). To be sure, expressive conduct does not forfeit its expressiveness just because it's accompanied by speech—consider someone who burns an American flag during an anti-American chant. *See Johnson*, 491 U.S. at 399. But when the speech is necessary explanation for the conduct, that's "strong evidence that the conduct here is not . . . inherently expressive." *Rumsfeld*, 547 U.S. at 66.

That is enough to end this analysis, because without expressive conduct, the First Amendment is not implicated. *See Tagami*, 875 F.3d at 378. But even "assum[ing] for the sake of argument" that the conduct here is "communicative enough to warrant some degree of First Amendment

13

protection," The Bail Project has not shown a likelihood of success on the merits. *Id.* "When 'speech' and 'nonspeech' elements are combined in the same course of conduct," courts apply an intermediate level of scrutiny under *O'Brien*. *Id.* at 378–79 (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)). "Under the *O'Brien* test, a law survives First Amendment scrutiny" if:

> (1) The regulation is within the constitutional power of the government; (2) the regulation furthers an important or substantial government interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the restriction on alleged First Amendment freedoms is no greater than essential to further the government's interest.

*Id.* at 378–79. The Bail Project argues only that Indiana has no "important or substantial governmental interest" in regulating charitable bail organizations. Dkt. 26 at 21–22; dkt. 32 at 9–11. The Commissioner responds that "Indiana trial courts impose money bail in a complex system that must balance the constitutional rights of defendants with the court's assessment of the defendants' risk of flight and the safety of the community." Dkt. 29 at 20 (citing Ind. Code § 35-33-8-4(b)).

The Bail Project has not shown, at this preliminary-injunction stage, that there can be no important interest in regulating charitable bail organizations. While The Bail Project has a strong record of its clients appearing for court, dkt. 25-2 at 3, it has not explained why that should be Indiana's only concern. *See* dkt. 32 at 9–11. The Bail Project has not discussed, for example, what steps it takes, if any, to ensure the safety of the community, or explained why

14

Indiana doesn't have an interest in ensuring that charitable bail organizations consider the severity of the charged conduct or prior convictions. *See* Ind. Code. § 27-10-2-4.5(b), (g) (prohibiting charitable bail organizations from paying cash bail for defendants who are charged with a crime of violence or are charged with a felony after having been convicted of a crime of violence). The Bail Project has thus not shown a likelihood of success under *O'Brien*.

None of this, of course, criticizes The Bail Project's intent or mission, or casts doubt on the sincerity of its advocacy. But under Seventh Circuit precedent, The Bail Project's regulated conduct is not inherently expressive, so The Bail Project has not shown a likelihood of success on this First Amendment claim.

### B. Fourteenth Amendment Equal Protection

The Bail Project argues that HEA 1300 violates the Equal Protection Clause because it treats charitable bail organizations differently than anyone else who might pay bail, without a rational reason for doing so. Dkt. 26 at 22–23. The Commissioner responds that HEA 1300 survives rational-basis review because it's related to the legitimate government interest of "regulating major actors in the bail industry differently based upon their distinct responsibilities and accountability in the criminal justice system." Dkt. 29 at 22.

Rational-basis review, which the parties agree applies here, is "the most lenient form of judicial review." *Monarch Beverage Co. v. Cook*, 861 F.3d 678, 681 (7th Cir. 2017). "This deferential standard of review is a notoriously heavy legal lift for the challenger." *Id.* To succeed, "the challenger must negate every

15

conceivable basis that might support the challenged law, and it is entirely irrelevant whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.*

The Indiana General Assembly undoubtedly has an interest in regulating pretrial release of defendants in criminal cases. *See DeWees*, 180 N.E.3d at 268 (explaining Indiana's comprehensive statutory framework). The Bail Project thus has not shown a likelihood of success on its claim that Indiana has no interest in regulating charitable bail organizations. The Bail Project argues that Indiana cannot rationally do so because it doesn't also regulate, for example, churches or individuals with the financial means to pay cash bail for others. Dkt. 32 at 11. But that doesn't make it necessarily irrational to regulate entities that "exist[ ] for the purpose of depositing cash bail." Ind. Code § 27-10-2-4.5(b). The General Assembly could reasonably think that organizations with such a purpose—"major actors in the bail industry," as the Commissioner describes them—are likely to have policy preferences different than its own. *See* dkt. 29 at 23. And it could reasonably be concerned that, without regulation, charitable bail organizations wouldn't have the financial accountability and incentives that the statutory scheme otherwise assumed were present. *Id.* That's enough to survive rational-basis review here. *See Tully v. Okeson*, 977 F.3d 608, 616 (7th Cir. 2020) ("[R]ational-basis review is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.").

### C. Remaining First Amendment Challenges

The Bail Project also argues that HEA 1300 violates the First Amendment because it gives the Commissioner "unfettered discretion" whether to certify it as a charitable bail organization. Dkt. 26 at 14–16. It adds in a footnote that the certification standards are unconstitutionally vague because they don't provide enough clarity to avoid discriminatory enforcement. *Id.* at 16 n.8. The Commissioner responds that The Bail Project has not been through the certification process, which is still being developed by the Department of Insurance. Dkt. 29 at 11. In reply, The Bail Project argues that the Commissioner waived any argument by failing to respond to its footnote that mentioned vagueness concerns. Dkt. 32 at 4.

The Court need not decide whether the Commissioner waived any argument about vagueness concerns because the burden at this stage remains on The Bail Project to show why a preliminary injunction is appropriate. *See Cassell*, 990 F.3d at 544. It has not done so.

The Bail Project's argument that the Commissioner retains too much discretion relies on its argument that the act of paying cash bail is inherently expressive conduct. *See* dkt. 26 at 15 (citing *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 756 (1988)).[6] Indeed, it clarifies that it is not

---

[6] The Bail Project also assumes that it will be subject to "the judgment of the commissioner" in its initial certification, dkt. 26 at 15 n.6, even though the statutory section at issue allows the Commissioner to deny certification based on an organization's "conduct of affairs under the certification." Ind. Code § 27-10-2-4.5(f). The Commissioner has not said that it will interpret the statute to apply to an initial application. *See* dkt. 29.

questioning the "similar if not identical" standards governing bail-bond agents, because bail-bond agents "are not exercising their First Amendment rights when they pay bail." Dkt. 26 at 16 n.7. For the reasons explained above, The Bail Project has not shown a likelihood of success justifying a preliminary injunction on the underlying First Amendment claims. Since this claim relies on those arguments, it also cannot support a preliminary injunction.

The Bail Project's vagueness challenge similarly invokes the underlying First Amendment claims. Dkt. 26 at 16 n.8 (citing *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012)). Since The Bail Project has not shown that its vagueness challenge implicates the First Amendment, HEA 1300 "is analyzed as applied to the specific facts of the case." *United States v. Nagelvoort*, 856 F.3d 1117, 1130 (7th Cir. 2017). But the Commissioner has not yet promulgated rules governing the certification process, The Bail Project has not yet applied to be certified, and this argument—raised only in a footnote—does not analyze HEA 1300's potential application to The Bail Project's eventual application for certification. The Bail Project therefore has not shown a likelihood of success on this claim.

# IV.
# Conclusion

Because The Bail Project has not shown a likelihood of success on the merits to justify a preliminary injunction, the motion for preliminary injunction is **DENIED**.  Dkt. [6].[7]

**SO ORDERED.**

Date: 6/29/2022

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
Jefferson.Garn@atg.in.gov

Lydia Ann Golten
INDIANA ATTORNEY GENERAL
lydia.golten@atg.in.gov

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

---

[7] Because The Bail Project has not shown a likelihood of success on the merits justifying a preliminary injunction, the Court does not consider the other preliminary injunction factors.  *See Adams v. City of Chicago*, 135 F.3d 1150, 1154 (7th Cir. 1998).

Caryn Nieman Szyper
INDIANA ATTORNEY GENERAL
caryn.szyper@atg.in.gov